UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORNELIUS HERRING and
GEOFFREY HOWARD,

       Plaintiffs,

v.                                                                    Civil Case No. 22-11109
                                                                        Honorable Linda V. Parker

CITY OF ECORSE, LAMAR TIDWELL,
MICHAEL MOORE and
NARDA BRUNO,

       Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE DEFENDANTS' MOTION TO DISMISS

On May 20, 2022, Plaintiffs filed this action against Defendants alleging

First Amendment retaliation in connection with Plaintiffs' employment as police

officers with Defendant City of Ecorse ("Ecorse").  The matter is presently before

the Court on Defendants' motion to dismiss based on the doctrine of res judicata.

(ECF No. 7.)  The motion has been fully briefed.  (ECF Nos. 9, 10.)  Finding the

facts and legal issues adequately presented in the parties' briefs, the Court is

dispensing with oral argument pursuant to Eastern District of Michigan Local Rule

7.1(f).

## I.     Standard of Review

Defendants' motion is filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  This presumption is not applicable to legal conclusions, however.  *Iqbal*, 556 U.S. at 668.  Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. (citing Twombly, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss.  *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)).  However, "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central

2

to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528

F.3d 426, 430 (6th Cir. 2008).

## II.    Factual and Procedural Background

### A.    The Parties

Plaintiffs are former long-time veterans of Ecorse's Department of Safety

("police department"). (Compl. ¶¶ 12, 18, ECF No. 1 at Pg ID 7, 5.)  Plaintiffs are

African American.  (Herring State Compl. ¶ 10, ECF No. 7-4 at Pg ID 88; Howard

State Am. Compl. ¶ 10, ECF No. 7-5 at Pg ID 99.)

Defendant Lamar Tidwell is Ecorse's Mayor and its chief law enforcement

officer. (Compl. ¶ 7, ECF No. 1 at Pg ID 4.)  Defendant Michael Moore was the

Director of the police department during the relevant period.  (*Id.* ¶ 8, Pg ID 5.)

Defendant Narda Bruno was the Deputy Director of the police department during

the relevant period.  (*Id.* ¶ 9, Pg ID 5.)

### B.    Plaintiffs' Reports Regarding LEIN Information & Vehicles

In July 2018, Plaintiffs learned "that police officers were using impounded

vehicles for their personal [use] or other improper purpose and [were] directing

tow company personnel to falsify information to insurance companies regarding

the nature of the impound or property." (*Id.* ¶ 31, Pg ID 9.)  This information

related to Ecorse police officer Kevin Barkman, as well as officers in other

metropolitan Detroit police departments.  (*Id.* ¶¶ 32, 34, Pg ID 9, 10.)  On October

3

31, 2018, Plaintiffs shared this information with the United States Federal Bureau of Investigations Public Corruption Task Force, as Plaintiffs believed the activity constituted insurance fraud and theft or conversion of seized vehicles.  (*Id.* ¶ 33, Pg ID 10.)

Plaintiffs spoke with FBI Special Agent Peter Ackerly on that date.[1]  (*Id.* ¶ 34, Pg Id 10.)  Plaintiffs "provided information in federal and state investigations into one or more criminal vehicle seizure schemes reportedly orchestrated by police officers in metro-Detroit [police] departments and involving illegal police raids[,] police taking, misuse and/or conversion of seized vehicles[,] falsification of LEIN records[,] and/or insurance fraud."  (*Id.*)  Plaintiffs directly participated in these external investigations.  (*Id.* ¶ 35, Pg ID 10.)

### C.    Plaintiffs' State Court Lawsuits

In July 2018, Plaintiffs filed separate complaints in state court against Ecorse, Mayor Tidwell, and Director Moore (hereafter collectively "Defendants"),[2]

---

[1] In a subsequent paragraph of their Complaint, Plaintiffs refer to Ackerly as a Michigan Attorney General Special Agent.  (*See* Compl. ¶ 35, ECF No. 1 at Pg ID 10.)  Which agency Ackerly works for is not pertinent to the pending motion, however.

[2] While Deputy Director Bruno was not named as a defendant in the state court lawsuits, the Court finds it less confusing to use this collective identifier throughout this decision.  Moreover, as discussed infra at n. 5, Deputy Director Bruno is in privity with the state court defendants.

which were amended in October 2019.  (Herring State Compl., ECF No. 7-4;

Howard State Am. Compl. ECF No. 7-5; Herring State Am. Compl., ECF No. 9-

3.)[3]  The attorneys representing Plaintiffs in the pending lawsuit also represented

them in the state court proceedings.  (*Id.*)  The lawsuits were consolidated.  Both

complaints alleged discrimination and retaliation in violation of Michigan law.[4]

(*Id.*)

### 1.    Allegations in the State Court Lawsuits

In his state-court pleading, Howard took issue with a disciplinary warning he

received after lighting a cigar when on duty inside the Ecorse police department,

when other employees were not disciplined, suspended, or terminated for

committing more serious offenses.  (Howard State Am. Compl. ¶¶ 14-15, 27, ECF

No. 7-5 at Pg ID 99, 101.)  Howard alleged that he complained about misconduct

by fellow employees, including a social media posting offensive to African-

American individuals, but no action was taken against these co-workers.  (*See e.g.,*

*id.* ¶¶ 17-19, Pg ID 100.)  Howard also alleged facts concerning the preferential

---

[3] Howard's initial state court complaint is not part of the record.  However, the
Court finds it unnecessary to review the pleading to resolve Defendants' motion.

[4] In their state court pleadings, Herring and Howard both alleged race
discrimination.  Howard also alleged gender discrimination.

treatment of Deputy Director Bruno.  (*See id*. ¶¶ 22, 28-31, Pg ID 100-02; Howard

Mot. Amend ¶¶ 3-8, ECF No. 7-10 at Pg ID 585-87.)

Herring alleged in his complaint that in August 2017, he "exposed

Defendant Moore and a coworker for violation of LEIN procedures, possibly being

a criminal offense [sic] and failed [sic] to forfeit vehicles for financial purpose."

(Herring State Compl. ¶ 14, ECF No. 7-4 at Pg ID 88.)  Herring further alleged that

he had "requested an investigation against a coworker for not removing stolen

vehicles from LEIN and failing to notify the owner[s] regarding the recovery of

their vehicles." (*Id*. ¶ 19, Pg Id 89.)  According to Herring, he was confronted by

the coworker who cussed at Herring.  (*Id.* ¶ 16, Pg ID 89.)  Herring complained to

Director Moore regarding the co-worker's behavior, but Director Moore did

nothing.  (*Id*. ¶¶ 17, 18, Pg ID 89.)

Herring asserted that Director Moore ignored the misconduct of co-workers

(that described above as well as other instances) while rules and policies were

enforced against Herring in retaliation for his protected conduct, which included

his requests for investigations concerning misuse of the LEIN system along with

other perceived misconduct by co-workers.  (*See generally id*.)  According to

Herring, Director Moore charged Herring with insubordination and neglect of duty

for identifying a vehicle as "abandoned" rather than "stolen" in the LEIN system,

although a coworker provided the false information in LEIN to forfeit vehicles in

Ecorse.  (*Id*. ¶ 32, Pg ID 91.)  Herring alleged that Director Moore and a co-worker "used this false information to make money and to forfeit vehicles" and that "[m]isuse of the LEIN system is illegal."  (*Id*. ¶ 33, Pg ID 91.)  Herring also alleged that he had been treated differently than Caucasian officers and that Deputy Director Bruno received preferential treatment.  (*Id*. ¶¶ 35-36, 41, Pg ID 91, 92.)

In the count of their state court complaints alleging retaliation, Herring and Howard alleged that they "opposed and complained about Defendant's unlawful harassment, discrimination[,] and retaliation against [them] and against other employees" and that they were "retaliated against . . . because of such opposition complaints and charge."  (*Id*. ¶¶ 58, 59, Pg ID 95; Howard State Am. Compl. ¶¶ 63, 64, ECF No. 7-5 at Pg ID 108.)

## 2.    Dispositive Motions and Rulings as to Howard's Claims

Defendants filed a motion for summary disposition as to Howard's state court claims on February 6, 2020, arguing in part that Howard failed to demonstrate an adverse employment action on which to base his claims.  (MSD as to Howard, ECF No. 7-9.)  In response to Defendants' motion, Howard asserted that he was "being punished because of his cooperation with the Michigan Attorney General's Office with regards to driving vehicles that were reported stolen or abandoned[.]"  (Howard MSD Resp. at 10, ECF No. 7-11 at Pg ID 615.)  Howard also asserted  that he was "being intimidated and harassed by the Chief

[Director Tidwell], Mayor, and coworkers for attempting to shed some light on a possible public corruption scandal." (*Id*.)  As one example, Howard pointed to Director Moore's state court deposition testimony, where he described Howard and Herring as a "cancer to the department" and "poison[ing a coworker.]" (*Id*. at 12, Pg ID 617.)

The state court granted Defendants' summary disposition motion as to Howard on August 18, 2020, finding insufficient evidence that Howard was subjected to an adverse employment action.  (State Ct. Op. & Order in Howard, ECF No. 7-7.)  The decision discussed evidence offered by Howard, including an October 11, 2018 letter to him from Director Moore.  (*Id*. at 2-3, Pg ID 121-22.)  In that letter, Director Moore addressed discussions between Howard and Herring concerning "the manner in which the City's Mayor and a police department corporal had 'obtained their personal vehicles,' and were the latest in 'a string of assertions and allegations that have been put forward by [Howard] and Officer Herring asserting improper conduct, illegal conduct[,] and neglect of duty and responsibilities . . .." (*Id*.)  The state court also acknowledged an incident Howard described where "an unspecified Corporal in the Ecorse Police Department, who changed the VIN numbers of vehicles in the possession of Ecorse Police, failed to report the stolen or abandoned vehicle on time, kept the vehicles up to eight months and lit [sic] to the insurance company, and would attend staff and

command schools with the vehicle in question." (*Id.* at 2, Pg ID 122 (cleaned up).)
The state court further considered Howard's deposition testimony that coworkers
were "against [him] and Herring for reporting possible criminal activity" and that
the "investigation has caused . . . all kind of confusion in the police department."
(*Id.* at 3-4, Pg ID 123-24.)

Howard filed a motion for reconsideration focusing on Director Moore's
October 11, 2018 letter, which referred to Howard and Herring's discussions
regarding the handling of vehicles by Mayor Tidwell and a police department
corporal. (Mot., ECF No. 7-12.) Howard specifically noted Director Moore's
statement threatening "immediate suspension" for engaging in "[a]ny further
conduct related to similar activity . . .." (*Id.* at 1, Pg ID 754.) Howard argued that
he "was subjected to a reprimand and possible criminal action for . . . reporting
alleged misconduct regarding use of impounded vehicles by the Mayor and other
offers in the Ecorse Police Department." (*Id.* at 2, Pg ID 755.) The state court
denied Howard's motion on September 29, 2020.

### 3.    Dispositive Motion and Ruling as to Herring's Claims

In the meantime, Defendants filed a motion for summary disposition as to
Herrings' state court claims on August 24, 2020. (MSD as to Herring, ECF No. 7-
8.) In his response to the motion, Herring discussed his exposure of Director
Moore and a coworker for alleged violations of LEIN procedures and failure to

forfeit vehicles.  (Herring Resp., ECF No. 7-13 at Pg ID 894-94.)  Herring also

discussed Deputy Director Bruno's promotion and the failure to promote Herring.

(*Id.* at Pg ID 898.)  Herring asserted that he was "being punished because of his

cooperation with the Michigan Attorney General's office with regards to driving

vehicles that were reported stolen or abandoned."  (*Id*. at Pg ID 903.)  Herring also

pointed to Director Moore's "like a cancer" deposition testimony, when asked to

describe the effect of Plaintiffs' conduct on the department.  (*Id*. at Pg ID 899.)

Herring further discussed his termination on October 11, 2019 (while the state

court litigation was pending), and his loss of retirement benefits.[5]  (*Id*. at Pg ID

905.)

The State court granted Defendants' summary disposition motion as to

Herring's claims on March 19, 2021.  (State Ct. Op. & Order in Herring, ECF No.

7-6.)

---

[5] Curiously, Herring did not discuss this termination in his amended state court
pleading despite the fact it happened *five days before* the pleading was filed.  (*See
generally* Herring State Am. Compl., ECF No. 9-3.)  Presumably this termination
was subsequently reversed, as Plaintiffs now allege that Herring was required to
undergo a mental fit for duty evaluation in May 2021 "notwithstanding . . . [he]
was only months away from retirement . . . ."  (Compl. ¶ 36(n), ECF No. 1 at Pg ID
13.)

### D.      Plaintiffs' Federal Lawsuit

As indicated, Plaintiffs filed the instant lawsuit on May 20, 2022.  In their

Complaint, brought pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Defendants

violated their First Amendment rights to freedom of speech and association.  (*See*

*generally* Compl., ECF No. 1.)  Specifically, as to their "freedom of speech" count,

Plaintiffs allege that they suffered retaliation in response to their reports of

suspected corruption related to the LEIN system and theft or conversion of seized

vehicles and participation in the related investigations.  (*See, e.g., id*. ¶¶ 34-36,  Pg

ID 10-14.)  In their "freedom of association" count, Plaintiffs assert that they were

"punished" for associating with the individuals to whom they made their reports.

(*See id.* ¶¶ 76-79, Pg ID 24-25.)

More specifically, Plaintiffs allege (although not in this chronological order)

that Defendants retaliated against them by:

- September 2019-December 2019:  "[F]iling, or causing to be filed, false claims of criminal activities against Plaintiffs with the Michigan State Police."

- 11/20/19:  "[C]ausing to be filed false allegations of Plaintiffs' dishonesty and corruption as police officers with Wayne County Prosecutor Kym Worthy for the purpose of having the Plaintiffs listed on the career ending Brady/Giglio list."

- 12/13/19:  "[G]iving false testimony under oath that Plaintiffs were homophobic, misogynistic, mentally unstable, incompetent and the subject of a criminal

11

conspiracy investigation by the Michigan State Police."

- 2/20/20: "[O]fficially informing an Ecorse Police Officer that he had better stay away from Plaintiffs or his future as a police officer would be adversely impacted."

- 2/20/20: "[F]alsely telling an Ecorse Police Officer that Wayne County Prosecutor Kim Worthy had issued criminal warrants against Plaintiffs."

- August 2020: "[R]eviving a long abandon[ed] position of deputy director . . . so Defendant Bruno could be promoted, but refusing to promote Plaintiff Howard to lieutenant even through [sic] the position stood vacant and needed to be filled, and then responding to Plaintiff Howard's appropriately filed grievance with personal, vitriolic[,] and unprofessional attacks on Howard's character in an official and permanently retained document."

- 9/23/20: In an "official email directly referencing the FBI corruption investigation, stating to officials at the City of Ecorse that Plaintiffs were homophobic" and "that Plaintiff Howard was physically and mentally unstable and unfit for duty."

- 10/1/20: In a Detroit News article, "[f]alsely and publicly naming Plaintiffs as being homophobic" and stating that "Plaintiff Herring was fired from his job as a police officer for corruption in an attempt to undermine and derail the public corruption investigation being conducted by the FBI and State Attorney General's Office."

- 5/18/21: "Arbitrarily and capriciously requiring Plaintiff Herring to undergo an unnecessary and unwarranted[] mental fit for duty evaluation . . . in an

> attempt to deny him the medical coverage and pension
> he had worked 30 years to earn and enjoy in his
> retirement."

- 11/20/21: Moore filed "a federal lawsuit . . . falsely stating that
  Plaintiffs were homophobic . . .."

- In 2022: "[A]rbitrarily and capriciously requiring Plaintiff Howard
  to undergo an unnecessary and unwarranted[] physical and mental
  fit for duty evaluation in an attempt to harass, terminate, and
  subject [him] to ridicule, embarrassment[,] and an inordinate
  amount of stress."

- 3/20/22: "Deputy Director Bruno charged Plaintiff [Howard] with
  misconduct for complaining directly to City leadership" in
  response to a February 22, 2020 memo from Plaintiffs "to City
  Administrator Richard Marsh, Mayor Tidwell, and the City
  Council, protesting the 'threats and false allegations by [Director]
  Moore and the city attorney,' and iterating . . . complaints of an
  ongoing hostile environment."

(Compl. ¶¶ 36(b)-(n), 50-51, ECF No. 1 at Pg ID 11-14, 17.)  Plaintiffs also allege

that, on some unspecified date(s), Defendants (i) "[a]dmonish[ed] other officers to

stay away from Sergeants Howard and Herring, saying they were a 'cancer'" and

(ii) "[p]rosecut[ed] false, formal claims of sexual harassment against Plaintiffs that

were alleged by Sargent Barkman . . . in an attempt to undermine and derail the

investigation."  (*Id*. ¶ 36(a), (*o*), Pg ID 11, 14.)

Further, according to Plaintiffs, Mayor Tidwell, who allegedly was involved

in the unlawful purchase of at least one of the vehicles subject to the corruption

investigation, was angered by Plaintiffs' cooperation with the investigation and

"warned Ecorse [police department] officers that their job was to back up fellow officers and that he would take 'corrective action' against those officers who did not do so[]" or who "made 'false' statements about him[.]" (*Id.* ¶¶ 40, 41, Pg ID 15.) Additionally, Director Moore and Deputy Director Bruno "targeted Plaintiffs, impugning their reputation, attacking their integrity[,] and issuing unmerited misconduct claims in an . . . effort to discredit Plaintiffs, build a file against them[,] and force their resignation or termination." (*Id.* ¶ 46, Pg ID 16.) "Plaintiffs, who were award-winning officers with no discipline for more than 20 years, suddenly began to receive multiple unwarranted disciplinary actions, suspensions[,] and terminations without cause." (*Id.* ¶ 49, Pg ID 16-17.)

## III.  Parties' Arguments

Defendants argue that Plaintiffs' claims are barred by the doctrine of res judicata because they arise from the same transactions and allegations related to Plaintiffs' employment that were litigated and resolved in Defendants' favor in the state court lawsuits. Defendants maintain that Plaintiffs' current First Amendment claims could have been raised, but were not, in the prior litigation.

Plaintiffs respond that res judicata does not apply because their "federal claims are completely different from their state claims" and their claims are based on "new incidents of retaliation by the Defendants that Plaintiffs were not aware of until the aftermath of their original state lawsuits and could not (and did not)

address in their prior cases." (Resp. at 4-5, ECF No. 9 at Pg ID 1027-28.)

Plaintiffs also argue that their current claims are distinct from those in the state

court litigation because their participation in the corruption investigation was not

within the scope of their duties as Ecorse police officers; instead, they were

"citizens who were retaliated against for making statements of public concern[.]"

(*Id.* at 5, 15, 16-24, Pg ID 1028, Pg ID 1028, 1038, 1039-47.)

In reply, Defendants maintain that at least some of the purported "new" facts

on which Plaintiffs base their retaliation claims occurred before the state actions

were dismissed.  Defendants further argue that even if Plaintiffs' retaliation claims

are based, in part, on facts arising after the dismissal of the state court lawsuits, the

claims are barred because facts known to Plaintiffs when they could have amended

their state court pleadings enabled them to assert their current retaliation claims.

Defendants point out that, as early as August 2017, Plaintiffs have spoken out

about this alleged public corruption and that Plaintiffs asserted during the state

litigation that they were being retaliated against for reporting and participating in

investigations concerning this corruption.  Defendants argue that any purported

"new" facts simply allege that Defendants are "continuing in the same course of

conduct." (Reply at 5, ECF No. 10 at Pg ID 1350 (quoting *Buck v. Thomas M.*

*Cooley L. Sch.*, 597 F.3d 812 (6th. Cir. 2010) (quoting *Dubuc v. Green Oak Twp.*,

312 F.3d 736, 751 (6th Cir. 2002)).)

## IV.    Applicable Law & Analysis

Res judicata or claim preclusion "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, prevent[s] inconsistent decisions, encourage[s] reliance on adjudication, and promote[s] comity between the state and federal courts." *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 744 (6th Cir. 2002) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 96 (1980)).  "A federal court must give a state court judgment the same preclusive effect it would have in the courts of the rendering state." *Id.* (citing 28 U.S.C. § 1738; *Heyliger v. State Univ. & Cmty. Coll. Sys.*, 126 F.3d 849, 851-52 6th Cir. 1997)).  Here, that is Michigan.

Michigan "employs a 'broad view of res judicata[.]'" *Buck*, 597 F.3d at 817 (citing *In re MCI Telecommc'ns Compl.*, 596 N.W.2d 164, 183 (Mich. 1999)). Under Michigan law, a successive action is barred if: "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first[.]" *Id.* (quoting *Abbott v. Michigan*, 474 F.3d 324, 331 (6th Cir. 2007)).  Plaintiffs dispute only Defendants' ability to satisfy this last requirement.[6]  (*See generally* Resp., ECF No. 9.)

---

[6] The state court's decisions granting summary disposition in favor of Defendants were decisions on the merits for purposes of res judicata.  *Smith v. Ameritech*, 130 F. Supp. 2d 876, 881 (E.D. Mich. 2000) (citing *Dart v. Dart*, 597 N.W.2d 82, 88

"Res judicata 'bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not.'" *Buck*, 597 F.3d at 817 (quoting *Adair v. State of Michigan*, 680 N.W.2d 386, 396 (Mich. 2004)).  "The test in Michigan is whether the same facts or evidence are essential to the maintenance of the two actions, not a comparison of the grounds for relief." *Dubuc*, 312 F.3d at 748 (citing *Jones v. State Farm Mut. Auto. Ins. Co.*, 509 N.W.2d 829, 834 (Mich. Ct. App. 1994)). Thus, it does not matter that Plaintiffs previously alleged discrimination and retaliation under Michigan's Elliott-Larsen Civil Rights Act, but here allege violations of their First Amendment rights pursuant to § 1983.  (*See* Pls. Resp. Br. at 16-17, ECF No. 9 at Pg ID 1039-40.)  Nor does it matter that Plaintiffs may have been "speak[ing] as [] citizen[s] addressing matters of public concern." (*Id.* at 17, Pg ID 1040 (citations omitted).)[7]  (*Id.* at 17, Pg ID 1040.)  This is because,

---

(Mich. 1999)); *Chakan v. City of Detroit*, 998 F. Supp. 779, 783 (E.D. Mich. 1988).  The defendants in the state court litigation are the same parties named here, with the exception of Deputy Director Bruno.  However, Deputy Director Bruno, who is now Ecorse's Chief of Police, is in absolute privity with the defendants in the former action.  *See Larry v. Powerski*, 148 F. Supp. 3d 584, 594-95 (E.D. Mich. 2015) (citing *McCoy v. Michigan*, 369 F. App'x 646, 650 (6th Cir. 2010)).

[7] Plaintiffs seem to be referring to this phrase to suggest that their current claims arise from their status as citizens rather than employees of the Ecorse police department, and are thus unrelated.  However, Plaintiffs' federal retaliation claims, like their state court claims, allege adverse treatment (i.e. injury) related to their

"[w]hether a factual grouping constitutes a transaction for purposes of res judicata is determined pragmatically, by considering whether the facts are related in *time, space, origin or motivation*, and whether they form a convenient trial unit." *Id.* (quoting *Adair*, 680 N.W.2d at 398) (emphasis in original and brackets removed). The Sixth Circuit's decisions in *Buck* and *Dubuc* provide useful guidance in evaluating whether the allegations in Plaintiffs' federal complaint are part of the same transaction as the allegations in their state court lawsuits.

*Dubuc* involved a land use dispute between the plaintiff and the township where the land was located.  312 F.3d at 739.  The plaintiff charged the township with continuously retaliating against him for the exercise of his First Amendment rights, specifically the right to speak to the press and petition the courts.  "This retaliation consistently related to the development of [the plaintiff's] property, whether it be denial of a certificate for occupancy or refusal to allow a lot split." *Id*. at 748.  The court found that res judicata barred the plaintiff's federal actions—filed after four state court lawsuits—despite the plaintiff's argument that the township had engaged in additional retaliatory conduct subsequent to the state court litigation. *Id.*at 750-51.

---

employment.  The significance of Plaintiffs having allegedly spoken on a matter of public concern is that their speech is therefore protected. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  When a public employee speaks on a matter that is *not* of public concern, the employee's First Amendment retaliation claim fails. *Id.*

The "major issue" in *Dubuc*, the Sixth Circuit wrote, was "at what point later-occurring allegations give rise to new claims that could not have been raised in the earlier proceeding." *Id.* at 748. The Sixth Circuit explained that "[e]ven if there were some alleged new facts that arose after the filing of [the previous lawsuit], it does not preclude application of res judicata. The key issue is whether [the plaintiff] could have amended his complaint in [the previous lawsuit] to include these new manifestations of alleged retaliation." *Id.* at 749. The court clarified that it is not a question of whether the plaintiff tried but was denied the opportunity to raise the claims previously. *Id.* at 750. Instead, the question is whether the plaintiff could have tried. *Id.* ("The fact that [the plaintiff] tried and never was able to [raise his First Amendment claims in the previous litigation] does not provide support for his being able to reraise this claim in federal court."). The *Dubuc* court explained further:

> If retaliation persists after the victim prevails in an initial suit, or even if the victim does not prevail, then res judicata would not affect access to the courts. When the alleged additional manifestation of retaliatory animus occurs before adjudication on the merits of the initial suit, however, the victim is obliged to amend his or her initial complaint to add these new allegations. *See Cox v. Tennessee Valley Authority*, 16 F.3d 1218, 1994 WL 43433 at *4 (6th Cir. Feb.10, 1994) (unpublished opinion) (holding that, when a plaintiff becomes aware of additional facts or theories in the process of discovery, she should move to amend her complaint or face claim preclusion in subsequent suits). . . . The doctrine of res judicata would become meaningless if a party could

> continue to relitigate the same issue—whether the
> defendant was acting in retaliation of the plaintiff's
> exercise of constitutional rights—by merely positing a
> few additional facts that occurred after the initial suit. . . .
> When, as here, it is obvious that the alleged ongoing
> retaliation is actually the defendant continuing on the
> same course of conduct, which has previously been found
> by a court to be proper, a subsequent court must conclude
> that the plaintiff is simply trying to relitigate the same
> claim.

*Id.* at 750-51 (italics omitted).

Relying on *Dubuc*, the Sixth Circuit held in *Buck* that the district court correctly found the plaintiff's federal lawsuit barred. In *Buck*, the plaintiff filed a state court action against the law school she attended after being expelled, alleging disability discrimination under Michigan law and other state law claims. 597 F.3d at 814. In April 2002, the state court issued a preliminary injunction allowing the plaintiff to continue her law school education. *Id.* In March 2005, after the trial court granted summary disposition to the defendant on all but the plaintiff's disability discrimination claim and while defendant's appeal of that partial dismissal was pending, the plaintiff sought leave from the state trial court to file a supplemental complaint alleging misconduct during the reinstatement period. *Id.* The trial court granted the plaintiff leave to file a supplemental complaint but only as to events through the end of April 2002. *Id.* at 814-15.

In June 2006, the Michigan Court of Appeal reversed the trial court's denial of summary disposition and remanded with instructions for the trial court to grant

summary disposition to the law school on all of the plaintiff's claim.  *Id.* at 816.  In

the meantime, the plaintiff had been dismissed from the law school in March 2006.

*Id.* at 815-16.  She filed a lawsuit against the law school in federal court more than

a year later, alleging violations of federal and state disability discrimination

statutes and breach of contract claims.  *Id*. at 816.

The Sixth Circuit held that res judicata barred the plaintiff's federal claims

as her "allegations regarding [the law school]'s treatment between 2002 and her

second dismissal . . . in 2006 are part of the same transaction—alleged misconduct

and discriminatory animus by [the law school] towards her as a law student—as

the allegations giving rise to her first lawsuit."  *Id.* at 817.  The plaintiff argued that

"her federal complaint allege[d] many facts that had not occurred at the time that

she had filed her state court complaint."  *Id.*  The Sixth Circuit responded:

"[U]nder Michigan law, a plaintiff has a duty to supplement her complaint with

related factual allegations that develop 'during the pendency of' her state suit or

have them barred by res judicata."  *Id*.  It did not matter to the *Buck* court that the

state court limited the plaintiff's amended pleading to events through April 2002 or

that she had an opportunity to seek permission to add more recent events but failed

to do so or was unsuccessful in doing so.  *Id*. at 818.

In the present case, most of the retaliatory actions alleged in Plaintiffs'

Complaint occurred while the state court actions were pending.  The Court

acknowledges that Plaintiffs did not expressly base their retaliation claims on those facts in their state court pleadings.  Nevertheless, they could have.  In fact, Plaintiffs repeatedly asserted in those proceedings that they were being treated unfairly due to their reports regarding misuse of the LEIN system and public corruption related to seized vehicles and due to their cooperation with federal and state investigations into that reported activity.  (*See, e.g.*, State Ct. Op. & Order in Herring at 5-6, ECF No. 7-6 at Pg ID 114-15 (quoting Herring MSD Resp. at 14, 16-17, ECF No. 7-13 at Pg ID 903, 905-06) ("Plaintiff is being intimidated and harassed by the Chief, Mayor, and coworkers for attempting to shed some light on a possible public corruption scandal" and "The chief has, throughout the course of this litigation, continued his harassment of the Plaintiff"); Herring MSD Resp. at 14, ECF No. 7-13 at Pg ID 903 ("Plaintiff is being punished because of his cooperation with the Michigan Attorney General's Office with regards to driving vehicles that were reported stolen or abandoned"); State Ct. Op. & Order in Howard at 3-4, ECF No. 7-7 at Pg ID 123-24 (quoting Howard as stating that he received "constant write-ups" and "all my coworkers are against myself and . . . Herring for reporting possible criminal activity").)  Plaintiffs now allege that their protected speech and/or conduct—which occurred as early as October 2018—led to retaliation by Defendants from September 2019 through sometime in 2022.  The

actions Plaintiffs complain about in their state and federal lawsuits are related in origin, motivation, and, at least in part, time.

Undoubtedly, some of the now alleged retaliatory conduct occurred after Plaintiffs filed their state court complaints in July 2018. However, almost all of the conduct occurred while the state court litigation was pending and any retaliation claim based on that conduct was ripe at the time.[8]  As the Sixth Circuit stated in *Buck* and *Duduc*, "under Michigan law, [P]laintiff[s] ha[d] a duty to supplement [their] complaint[s] with related factual allegations that develop[ed] '*during the pendency of*' [their] state suit[s] or have them barred by res judicata."[9] *Buck*, 597 F.3d at 817 (citing *Adair*, 680 N.W.2d at 398) (emphasis added); *Duduc*, 212 F.3d at 750 ("when the alleged additional manifestation of retaliatory animus occurs before adjudication on the merits of the initial suit . . . the victim is obliged to amend his or her initial complaint to add these new allegations."). Therefore, to

[8] The Sixth Circuit's discussion in *Buck* regarding the plaintiff being barred from litigating matters that occurred during the pendency of the state court proceedings and her obligation to seek to supplement her complaint to allege those newly-arisen facts *even on remand*, 597 F.3d at 818 & n.2, leads this Court to conclude that Plaintiffs' claims are barred to the extent they are based on any conduct preceding the dismissal of the state court proceedings.

[9] Again, *Dubuc* reflects that it is irrelevant whether the request to amend was or would have been unsuccessful. *See Dubuc*, 312 F.3d at 750 (citing *Sherman v. Ludington*, No. 91-3936, 1992 WL 158878, at *7-8 (6th Cir. July 7, 1992)).

the extent Plaintiffs' current claims are based on conduct predating the dismissal of their state court lawsuits, they are barred by res judicata.[10]

*Larry v. Powerski*, 148 F. Supp. 3d 584 (E.D. Mich. 2015), which Plaintiffs cite, does not lead the Court to conclude otherwise. *Larry* is not similar to the pending manner in the way Plaintiffs claim.

In *Larry*, after being terminated for improperly accessing patient medical records, the plaintiff filed a lawsuit in state court against her former employer alleging wrongful discharge, violation of the Michigan Whistleblower Protection Act, and retaliatory discharge. 148 F. Supp. 3d at 588. The plaintiff claimed the "accusations were trumped up by her immediate supervisor, who was retaliating against [the plaintiff] as a result of bad blood between them, which resulted from,

---

[10] Plaintiffs do not provide a timeline as to two alleged acts of retaliation: (a) "[a]dmonishing officers to stay away from [Plaintiffs], saying they were a 'cancer'" (Compl. ¶ 36(a), ECF No. 1 at Pg ID 11); and (b) "[p]rosecuting false, formal claims of sexual harassment against Plaintiffs that were alleged by Sargent Barkman . . . in an attempt to undermine and derail the public corruption investigation . . ."(*id.* ¶ 36(*o*), Pg ID 14). The purported admonishments appear to have occurred during the state court litigation. (*See, e.g.*, Herring Resp. Br. at 10, ECF No. 7-13 at Pg ID 899 (citing Director Moore's deposition testimony where he referred to Plaintiffs as a "cancer" to the department); Howard Mot. ¶ 9, ECF No. 7-12 at Pg ID 755 (same)). The Court believes the alleged prosecution of false claims occurred before or during the state court litigation, as it appears the public corruption investigations which the claims were designed to undermine began in 2018. (*See* Pls. Resp. Br. at 1, ECF No. 9 at Pg ID 1024.) To the extent the Court is correct, Plaintiffs are barred by res judicata from basing their pending claims on those allegations.

24

among other things," the plaintiff filing a race discrimination charge against the supervisor with the Michigan Department of Civil Rights. *Id.* The case went to trial and the plaintiff prevailed. *Id.* She then filed a lawsuit in federal court against the supervisor claiming tortious interference with contractual relations, injurious falsehood, denial of procedural due process, and First Amendment retaliation. *Id*. at 588-89.

What Plaintiffs gloss over in their response brief (*see* Pls. Resp. at 12, ECF No. 9 at Pg ID 1035) is that the federal district court in *Larry* found all of the plaintiff's claims barred by res judicata except for her First Amendment retaliation claim, *Larry*, 148 F. Supp. 3d at 589. The district court concluded that the plaintiff's tortious interference, injurious falsehood, and procedural due process claims were "premised upon the same essential facts and events underlying [her] state court wrongful termination lawsuit" and were claims that the plaintiff could have raised but did not. *Id.* at 589, 496-97. The district court held that the plaintiff's retaliation claim was not barred by the doctrine of res judicata, but only because it concerned conduct that "had no temporal or transactional relationship to the termination [on which the plaintiff's claims in the state court lawsuit were based]. *Id.* at 598. As discussed above, the same cannot be said of Plaintiffs' state and federal claims as they *do* have a transactional relationship in that they are related at least by origin and motivation.

Plaintiffs argue generally that they "at no point throughout the entirety of their prior cases, had knowledge (nor could they have had any) of the facts and circumstances that form[] the basis of their current federal suit[.]" (Pls. Resp. at 4-5, ECF No. 9 at Pg ID 1027-28.)  However, as discussed above, Plaintiffs were aware of most, if not all, of the alleged retaliatory actions set forth in the current lawsuit, which arose before or while the state actions were pending, as Plaintiffs complained of that conduct there—whether in their pleadings or briefs or during their depositions.  It is not clear from the record, however, when Plaintiffs learned of the following: (a) September 23, 2020 official email stating that Howard was physically and mentally unfit for duty and that Plaintiffs were homophobic; (b) statements to the Detroit News in October 2020 that Plaintiffs were homophobic and corrupt; and (c) assertions in a federal lawsuit filed on November 20, 2020, alleging that Plaintiffs were homophobic. [11]  Their assertions that it was after the

---

[11] However, these allegations describe accusations about Plaintiffs purportedly made by Defendants in other contexts early in the state court litigation, at least some of which Plaintiffs undoubtedly were aware.  (*See, e.g.*, Compl. ¶ 36(*i*), ECF No. 1 at Pg ID 12 (alleging that on December 13, 2019—the date of Director Moore's state court deposition (*see* Moore Dep., ECF No. 7-11 at Pg ID 741)— "false testimony [was given] that Plaintiffs were homophobic, mentally unstable, incompetent, and the subject of a criminal conspiracy investigation by the Michigan State Police); Compl. ¶ 36(j), ECF No. 1 at Pg ID 12 (filing false allegations with the Wayne County prosecutor on November 20, 2019, accusing Plaintiffs of dishonesty and corruption).)

conclusion of the state court litigation is not supported by any evidence.  However, it is premature for the Court to require such evidence.

## V.     Conclusion

For the reasons stated above, the Court will enable Plaintiffs' claims to proceed *but only to the extent* based on the allegations directly above and those arising *after* the state court litigation concluded.  If further development of the record establishes that Plaintiffs in fact knew of any of these alleged facts and could have sought to amend their state court pleadings to include these "new manifestations of alleged retaliation," Defendants may renew their request to apply res judicata to them.

The Court's ruling is restricted to whether res judicata bars Plaintiffs' retaliation claims, as this was the sole focus of Defendants' motion to dismiss.  The Court has not been asked, and therefore does not opine on, whether Plaintiffs in fact can establish viable First Amendment retaliation claims based on those facts.

Accordingly,

**IT IS ORDERED** that Defendants' motion to dismiss (ECF No. 7) is **GRANTED IN PART AND DENIED IN PART**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: February 7, 2023